IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANNING AND CONSERVATION LEAGUE,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITED STATES BUREAU OF RECLAMATION,<br><br>    Defendant;<br><br>SAN LUIS & DELTA-MENDOTA WATER AUTHORITY; and WESTLANDS WATER DISTRICT,<br><br>    Defendants-Intervenors<br>    (remedies phase only). | No. C 05-3527 CW<br><br>ORDER GRANTING PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER |

    Plaintiff Planning and Conversation League moves for a temporary restraining order enjoining construction of the Intertie Project, discussed below, until its preliminary injunction motion is heard. Defendant United States Bureau of Reclamation has filed an opposition to Plaintiff's application for a temporary restraining order and motion for a preliminary injunction. Defendants-Intervenors San Luis & Delta-Mendota Water Authority and Westlands Water District (collectively, Intervenors) also oppose

Plaintiff's application for a temporary restraining order. Having considered all of the papers filed by the parties, the Court grants Plaintiff's application for a temporary restraining order.

BACKGROUND

In this action, Plaintiff challenges an environmental review of a proposed 500-foot-long pipeline and related pumps, which would connect the main delivery canals of two water diversion projects -- the federal Central Valley Project (CVP) and California's State Water Project (SWP) -- in California's Central Valley. These diversion projects draw their water from the estuary formed by the discharge of the Sacramento and San Joaquin River systems into the San Francisco Bay (Bay-Delta). The proposed pipeline at issue is known as the Delta-Mendota Canal/California Aqueduct Intertie (Intertie Project).

In September, 2004, the Bureau and the San Luis & Delta-Mendota Water Authority completed a joint environmental review of the Intertie Project titled "Delta-Mendota Canal/California Aqueduct Intertie Proposed Finding of No Significant Impact/ Negative Declaration and Draft Environmental Assessment/Initial Study" (Intertie EA/IS). The Intertie EA/IS was released for public comment in November, 2004. Plaintiff and others submitted comments on this study. Plaintiff commented that, because increased pumping associated with the Intertie Project could have significant environmental effects on the Bay-Delta, a full Environmental Impact Statement (EIS) should be prepared as required by the National Environmental Policy Act (NEPA). The Bureau did not prepare an EIS; instead, it signed a Finding of No Significant

2

Impact (FONSI).

Plaintiff filed this action on August 31, 2005. On January 12, 2006, the Court scheduled the parties' cross-motions for summary judgment for hearing on May 28, 2006.

On January 17, 2006, Defendant notified Plaintiff it had awarded the construction contract related to the Intertie Project. Construction on the Intertie Project is slated to begin on February 6, 2006.

## LEGAL STANDARD

A temporary restraining order may be issued only if "immediate and irreparable injury, loss, or damage will result to the applicant" if the order does not issue. Fed. R. Civ. P. 65(b). To obtain a temporary retraining order, the moving party must establish either: (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions regarding the merits exist and the balance of hardships tips sharply in the moving party's favor. See Baby Tam & Co. v. City of Las Vegas, 154 F.3d 1097, 1100 (9th Cir. 1998); Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).

The test for granting a temporary restraining order, like that for a preliminary injunction, is a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." Rodeo Collection, 812 F.2d at 1217 (quoting San Diego Comm. Against Registration & the Draft v. Governing Bd. of Grossmont Union High Sch. Dist., 790 F.2d 1471, 1473 n.3 (9th Cir. 1986)). The moving party ordinarily must show "a significant

3

threat of irreparable injury," although there is "a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases," <u>United States v. Odessa Union Warehouse Co-op</u>, 833 F.2d 172, 174, 175 (9th Cir. 1987), and vice versa.

## DISCUSSION

I. Likelihood of Success on the Merits

Plaintiff asserts that Defendant violated NEPA by not preparing an EIS. "[A]n EIS <u>must</u> be prepared if 'substantial questions are raised as to whether a project . . . <u>may</u> cause significant degradation of some human environmental factor.'" <u>Ocean Advocates v. U.S. Army Corps of Engineers</u>, 402 F.3d 846, 864 (9th Cir. 2005) (quoting <u>Idaho Sporting Cong. v. Thomas</u>, 137 F.3d 1146, 1149 (9th Cir. 1998) (alterations and emphasis in original)). Plaintiff argues that it has a high probability of success on the merits because, to trigger the requirement for an EIS, it "need not show that significant effects <u>will in fact</u> occur." <u>See id.</u> at 865 (quoting <u>Idaho Sporting</u>, 137 F.3d at 1150)(emphasis in original). Instead, Plaintiff need only raise substantial questions regarding whether the project may have a significant effect. <u>Id</u>.

As noted by Defendant, however, in reviewing its decision not to prepare an EIS, this Court's role is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." <u>Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc.</u>, 462 U.S. 87, 97-98 (1983). The Court may not substitute its own judgment for that of the agency; if the Court

4

determines that the agency took a "hard look" at a project's environmental consequences, the Court's review is at an end. See National Parks & Conservation Ass'n v. U.S. Dept. of Transp., 222 F.3d 677, 680 (9th Cir. 2000).

A.  Significant Impacts

Plaintiff argues that the Intertie EA/IS itself shows that the Intertie Project may have significant impacts on the environment. For example, the Intertie EA/IS predicted that the Intertie Project would move the saltwater/freshwater boundary one kilometer and reduce the delta smelt's habitat by generally less than five percent. Plaintiff contends that these may be significant impacts, especially considering that the Bay-Delta environment is already vulnerable. See Grand Canyon Trust v. FAA, 290 F.3d 339, 343 (D.C. Cir. 2002) (noting that when an environment is already vulnerable even a slight increase in adverse conditions "may represent the straw that breaks the back of the environmental camel"). Plaintiff notes that Defendant has previously recognized that these impacts, which it now purports to be minor, are significant: CALFED Bay-Delta Program Final Programmatic Environmental Impact Statement/Environmental Impact Report, prepared by Defendant and other agencies in July, 2000, states, "For special-status species, such as species listed under federal and California ESAs, harm to individual organisms and their habitat is considered a potentially significant adverse impact."

Defendant does not dispute that the Intertie EA/IS documents that harm to the habitats of special-status species, like the delta smelt, could occur. Instead, it contends that it conducted a

5

comprehensive and detailed analysis of the potential effects related to water quality and fisheries, and many other issues not discussed by Plaintiff, such as vegetation, wildlife and air quality, that its conclusion of no significance is supported by the record and that an EIS was not required. Defendant accuses Plaintiff of asking the Court to second-guess its conclusion that the Intertie Project will not have significant impacts on water qualities and fisheries, and reminds the Court that when reviewing a "scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." Baltimore Gas, 462 U.S. at 103. The Ninth Circuit has instructed, "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Wetlands Action Network v. U.S. Army Corps of Engineers, 222 F.3d 1105, 1121 (9th Cir. 2000). But that does not mean that the Court should merely rubber-stamp the conclusions reached by Defendant's specialists, especially if those conclusions may be unreasonable. As the Supreme Court explained in Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989), courts "should not automatically defer" to an agency "without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision." "A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." Id. (inner quotations omitted).

Thus, even providing Defendant with all the deference that it is due, the Court finds that serious questions regarding the merits of this argument exist.

B.  Cumulative Effects

Plaintiff argues that the Intertie EA/IS inadequately addressed cumulative impacts and thus an EIS was required.  It notes that NEPA does not allow projects to be analyzed in artificial isolation; instead, it requires a discussion of the cumulative impacts of the proposed project in combination with "past, present, and reasonably foreseeable future actions."  See 40 C.F.R. § 1508.7.  This discussion, however, "must be more than perfunctory."  Kern v. U.S. Bureau of Land Management, 284 F.3d 1062, 1075 (9th Cir. 2002).  The Ninth Circuit requires that the discussion of cumulative impacts provide some quantified or detailed information: "general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided."  Id. (quoting Neighbors of Cuddy Mt. v. U.S. Forest Serv., 137 F.3d 1272, 1279-80 (9th Cir. 1998)).

Defendant contends that it adequately assessed the cumulative impacts of reasonably foreseeable projects.  This contention, however, is based upon Defendant's definition of "reasonably foreseeable" and its determination of what is speculative.  For example, Defendant states that it did not analyze the cumulative effects of the South Delta Improvements Project (SDIP) because, at the time it released the Intertie EA/IS, no published draft environmental document for the SDIP was available.  According to

7

1  Defendant, a project is not "reasonably foreseeable" until it is
2  supported by published draft environmental documents.  See also
3  EA/IS 3-20 ("There are other actions and programs being evaluated
4  and implemented by CALFED agencies that could conceivably
5  contribute to cumulative impacts.  However, these are relatively
6  undefined at this time, and it would be speculative to include
7  these other programs in a cumulative analysis.")

8       But the Ninth Circuit has held otherwise.  In Muckleshoot
9  Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 812 (9th Cir.
10 1999), the court reversed the district court's determination that a
11 project was too speculative to require analysis.  It held that the
12 project was reasonably foreseeable, and should have been
13 considered, because a summary of the proposed project had been
14 prepared the year before, and, five months before the EIS was
15 issued, the Secretary of Agriculture formally announced the
16 proposed project to the public.

17      In response to Plaintiff's allegations that the Intertie EA/IE
18 contained only a perfunctory discussion of cumulative impacts,
19 Defendant notes that a more detailed analysis of cumulative impacts
20 is not required when the agency explains why definitive information
21 could not be provided.  Here, Defendant's justification was that
22 various projects were "too speculative" to consider.  But, based on
23 the Ninth Circuit's holding in Muckleshoot Indian Tribe, the Court
24 could find that this justification is arbitrary and capricious and
25 that Defendant does not provide the necessary and detailed
26 cumulative analysis, but only "broad and general statements devoid
27 of specific, reasoned conclusions."  Id. at 811.  Thus, there is a

8

strong likelihood that Plaintiff will succeed on the merits of this argument.

C. CALSIM II Modeling Studies

Plaintiff also argues that an EIS is required because the Intertie EA/IS, and the finding of no significant impact, were largely based on models which, while capable of predicting what might happen, are too unreliable to rule out the potential for significant impacts. Furthermore, NEPA requires advance disclosures of relevant short-comings in the data or models, which Plaintiff contends Defendant fails to disclose. See Lands Counsel v. Forester of Region One of the U.S. Forest Serv., 395 F.3d 1019, 1032 (9th Cir. 2004).

The Intertie EA/IS relies on CALSIM II, a model prepared by Defendant and California Department of Water Resources and used in most Central Valley water planning processes. In 2003, a panel of scientists prepared a peer review of CALSIM II and noted that, while the model's "strengths are many, so are its weaknesses." Plaintiff contends that, although Defendant relied almost exclusively on model-generated numbers to draw its conclusion that increasing Delta exports by thousands of acre-feet per year will not potentially create significant environmental impacts, the Intertie EA/IS did not disclose any weakness in the model, except when the model's predictions showed possible significant impacts.[1]

---

[1] On pages 3-78 and 3-85, Defendant discounted the CALSIM II's finding that, under certain conditions, the Intertie Project could increase the entrainment, i.e., killing, of delta smelt and striped bass by greater than forty to fifty percent: "The increased entrainment is attributable to a simulated increase in SWP pumping in June . . . . The simulated change in pumping is attributable to

9

When Plaintiff commented on this nondisclosure, and provided Defendant with a copy of the peer review, Defendant responded:

> We have used the best available data and the best available modeling tools. The data and modeling tools are similar and consistent with the data and modeling tools used in the NOAA BO. Consequently, the EA/IS analysis supports the conclusions to the extent required under CEQA/NEPA.

Defendant attacks Plaintiff's argument that the model is too unreliable by asserting that Plaintiff misconstrues the difference between using models for predictive purposes and for comparative purposes. Predictive models, it asserts, "are used to accurately represent physical systems and the potential that a range of physical inputs has to influence the state of physical systems"; whereas, comparative models "are used to identify trade-offs between the use of different operational alternatives for meeting system demands within the limits of allowable operations." Because Defendant used the model for comparative, not predictive, purposes, it asserts that Plaintiff's arguments regarding reliability and predictability are entirely misplaced. The scientific review of CALSIM II, however, rejected this assertion, noting that it was skeptical of the notion that, although the model might not generate a highly reliable absolute prediction, it could still produce a reasonably reliable estimate of the relative change in outcome. It noted that, for a predictive analysis, one runs the model once to predict an outcome; for a comparative analysis, one runs the model twice, first as a baseline and second with some specific change, in

---

rules within the CALSIM II model and does not represent changes in SWP pumping that would be expected with actual implementation of the Proposed Action."

10

order to compare the two results.  CALSIM II is not a perfect model; no model is.  But its use alone does not show that Defendant was arbitrary and capricious in reaching its finding of no significant impact.  As Plaintiff acknowledges, an EA/IS can rely on a model, provided it discloses the assumptions and limitations of the model.  See Sierra Club v. Castle, 657 F.2d 298, 332 (D.C. Cir. 1981) (upholding EPA's reliance on modeling because it provided necessary disclosure).

Defendant asserts that it sufficiently disclosed any assumptions and limitations.  It points to Appendix B, "CALSIM II Modeling Studies of the Delta Canal/California Aqueduct Intertie," which describes the methodology and the assumptions used in the models, including the assumption that an Environmental Water Account adequately funded to allocate water for fish protection would continue to exist.  It argues that it did not have to disclose any limitations of CALSIM II, because, as discussed above, it used the model to compare different alternatives and related environmental effects, not to predict a specific future environmental condition.

Defendant discounts Plaintiff's argument that it improperly assumed the existence of a long-term Environmental Water Account, asserting that the Environmental Water Account was properly included in the modeling scenarios.  It notes that the Environmental Water Account is entering its sixth year of operation and that it has publicly committed to continuing the Environmental Water Account, or, if it is discontinued, to providing the same level of fish protection by some other means.  But Defendant fails

11

to note that the Intertie EA/IS listed the Environmental Water Account among programs that are "in the very early planning and feasibility stages" and therefore were too speculative to include in a qualitative analysis. Plaintiff points out the inconsistency of including the Environmental Water Account as an assumption in the model but not as a factor in a qualitative analysis. Defendant's opposition, however, fails to address it. Nor does Defendant address Plaintiff's exhibit, showing the Environmental Water Account's dire lack of funding.

The Court finds that there is a reasonable likelihood that Plaintiff will succeed on the merits of this argument. See Lands Council, 395 F.3d at 1032 (finding that nondisclosure of relevant shortcomings in model violated NEPA).

D.  Intervenors' Argument

In addition to joining Defendant's arguments, Intervenors argue that Plaintiff cannot succeed because the Intertie Project does not alter the status quo. Intervenors note that the CVP Tracy Pumping Plant has a maximum authorized pumping capacity of 4,600 cubic feet per second (cfs) of water. Various constraints, however, have prevented it from operating at that capacity full-time; currently its pumping capacity is limited to approximately 4,200 cfs during the winter. The Intertie Project is intended to address one of these constraints and to enable the Tracy Pumping Plant to pump at its full capacity, which was approved before NEPA was enacted. See Westside Property Owners v. Schlesinger, 597 F.2d 1214, 1223-25 (9th Cir. 1979) (stating that, as a general matter, NEPA does not apply retroactively).

12

Intervenors argue that, because the Intertie project will only restore the Tracy Pumping Plant to its full, and already approved, capacity, an EIS is not required.[2]  The case they cite in support of this argument, however, is arguably distinguishable.  In <u>Upper Snake River Chapter of Trout Unlimited v. Hodel</u>, 921 F.2d 232 (9th Cir. 1990), the court noted that previously it had "held that where a proposed federal action would not change the status quo, an EIS is not necessary," ruling that "an EIS need not discuss the environmental effects of mere continued operation of a facility." 921 F.2d at 235 (quoting <u>Burbank Anti-Noise Group v. Goldschmidt</u>, 623 F.2d 115, 116 (9th Cir. 1980)).  The court in <u>Upper Snake River</u> determined that a dam's reduction in flow did not constitute a major federal action under NEPA because the reduction in flow was a routine and continuing operation of the dam.  Here, however, it is not clear if pumping 4,600 cfs is a routine and continuing operation of the Tracy Pumping Plant.

The Intervenors fail to provide the Court with evidence to show that pumping 4,600 cfs is a routine and continuing operation of the Tracy Pumping Plant, and thus the Court finds that this argument does not make it less likely that Plaintiff will succeed on the merits.

II.  Balance of Hardships

Plaintiff argues that the balance of hardships tips strongly in favor of the preliminary relief it seeks.  The Ninth Circuit has

---

[2] Intervenors contend that, although it was useful to informed decision-making, the Intertie EA/IS was not required under NEPA to analyze the effects of additional pumping at 4,600 cfs.

13

instructed, "Where an EIS is required, allowing a potentially environmentally damaging project to proceed prior to its preparation runs contrary to the very purpose of the statutory requirement." National Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 737-38 (9th Cir. 2001). Furthermore, as the Supreme Court has explained,

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545 (1987).

Defendant, however, contends that Plaintiff has proven no irreparable harm and that the balance of harms imposed by an injunction favors Defendant. It asserts that the alleged harm at issue is not the harm imposed by construction of the Intertie Project, but rather the environmental impacts caused by the operational effects of the water flowing through the Intertie, which is not scheduled to occur until late December, 2006, months after the Court hears the cross motions for summary judgment. However, Plaintiff also argues that the construction threatens irreversible environmental harms, for "[a]fter major investment of both time and money, it is likely that more environmental harm will be tolerated." Save the Yaak Committee v. Block, 840 F.2d 714, 718 (9th Cir. 1988).

Plaintiff also cites Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir. 1989), where then-Circuit Judge Breyer explained that

14

"the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation." See id. (finding that the "difficulty of stopping a bureaucratic steam roller, once started" is "a perfectly proper factor for a district court to take into account" on a motion for a preliminary injunction).  Although perhaps not irreparable harm, Plaintiff has shown serious harm that will be caused by beginning construction on the Intertie Project before the Court rules on the cross motions. That harm, however, must be balanced with the harm to Defendant and Intervenors.

Plaintiff contends that Defendant and its contractors will suffer little or no harm from a delay.  But Defendant has shown that it will suffer a financial hardship.  If construction of the Intertie Project is halted, Defendant will either have to suspend or terminate the construction contract; both alternatives are costly.  Under contract suspension, Defendant is still responsible for the contractor's daily cost; Defendant estimates that, given the size of the contract, the cost would amount to $3,000 to $5,000 per day.  In addition, Defendant would be responsible for any escalated cost of material and labor.  If Defendant terminated the contract, it would be responsible for all costs incurred by the contractor through the time the contract is terminated and for anticipatory profits, which it estimates would exceed one million dollars.

In addition to the financial harm it would experience, Defendant points to the harm that others, such as the public agencies who have advanced twenty-five million dollars toward

15

project construction, would experience.  Intervenors note that member districts are not earning any interest on that twenty-five million dollars, at a cost of about $2,600 per day.  They further note that, if the Intertie Project is not completed for use from January through March of 2007, CVP water users south of the Delta stand to lose up to 793 acre-feet of water supply during those months.  Defendant asserts that the public interests at stake weigh in favor of the Intertie Project moving forward.  It does not address Plaintiff's argument that the general public would be benefitted by an injunction because agencies can make better decisions, and adopt better policies and projects, if informed by adequate, and required, environmental studies.

The Court regrets the tax-payer dollars that will have to be spent due to the granting of this temporary restraining order, but those dollars could have been saved had Defendant conducted an EIS or waited to commit to a construction contract until after the legal challenges were resolved.  Balancing the hardships that each side will suffer, the Court finds that the balance tips sharply in Plaintiff's favor.  Environmental injury, as noted above, generally cannot be adequately remedied by money damages and it is often permanent.  Defendant has acknowledged that the Delta is a "critical resource" in "steady decline."  CALFED Bay-Delta Program Final Programmatic Environmental Impact Statement/Environmental Impact Report, 1-2.

III. Bond

Plaintiff states that it is a non-profit corporation pursuing environmental litigation in the public interest and requests that

16

the Court dispense with any security requirement.  See People of State of Cal. ex rel. Van De Kamp v. Tahoe Regional Planning Agency, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (finding that the district court properly exercised its discretion to allow a non-profit environmental group to proceed without posting a bond). Defendant objects to this request and asks the Court require a bond in the amount of at least $50,000, which would reflect the high-end amount of costs that Defendant would experience due to a temporary restraining order lasting ten days.  Citing Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113 (9th Cir. 2005), Defendant notes that environmental organizations are not exempt from the bond requirement.  In Save Our Sonoran, the court affirmed the district court's requirement of a $50,000 bond from an environmental organization.  408 F.3d at 1126.  But the court also recognized that it has affirmed nominal bonds in public interest cases.  Each case is fact-specific, and the court found that, as long as a district court does not set such a high bond that it serves to thwart citizen actions, it does not abuse its discretion.  Id.

Intervenors also request that Plaintiff be required to post a bond.  Noting that Plaintiff is a consortium of over one-hundred environmental organizations, Intervenors argue that, based on Plaintiff's size alone, it should have the resources to post a bond sufficient to protect the San Luis & Delta-Mendota Water Authority from any costs or damages resulting from being wrongfully restrained.

Because Plaintiff is a public interest organization, the Court will not require it to post a bond.

17

CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's application for a temporary restraining order. Defendant is enjoined from beginning construction on the Intertie Project until the preliminary injunction hearing. Plaintiff's motion for a preliminary injunction will be heard on February 14, 2006, at 2:00 p.m. If Defendant and/or Intervenors wish to file additional briefing, they must do so before noon on February 7, 2006; Plaintiff has until noon on February 9, 2006, to reply. The parties may stipulate to a longer briefing schedule and later hearing date.

IT IS SO ORDERED.

Dated: 2/3/06

CLAUDIA WILKEN
United States District Judge

18